in refusing to hold as matter of law that the answer could not be considered to enhance damages. We understand the general rule to be, as charged by the court in this case, that the motives impelling a defendant to set up matter in justification which is not proved may be considered by the jury in aggravation of damages. It cannot be said in this case that the instruction was entirely foreign to any matter involved in it, and that, therefore, there was no ground upon which an inference of bad faith in the reiteration of the libelous matter by allegations of the answer could be raised. The record is not without some evidence from which the inference of bad faith might be drawn. The defendant, at the request of the plaintiff, had published a refutation of its article, and has set up that fact in the answer. The instruction of the court upon this subject contained a correct statement of the law, and there was enough before the jury to permit the particular instruction to be given. No request was made by the defendant to present any different or other phase of the matter than that contained in the instruction as given.

On the whole case we are of opinion that the damages were not excessive, and that the judgment and order appealed from should be affirmed, with costs. All concur.

---

(68 App. Div. 242.)

BRUCE v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Appellate Division, Second Department. January 17, 1902.)

1. CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.
    In an action for personal injuries the burden is on the plaintiff to show affirmatively that his own negligence did not contribute to the accident complained of.

2. STREET CARS—INJURY TO PASSENGER—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.
    Plaintiff's intestate, who was a passenger on defendant's street car, left his seat as the car was about to enter a 33° curve, and went out on the front platform, from which he fell. One witness stated that the car was running 20 miles per hour, and, when it struck the curve, deceased was lifted from his feet, and thrown over a chain 3½ feet high across the entrance to the platform. Witness was about 1,400 feet distant. The evidence was overwhelming that there was no chain on the car. The motorman stated that his first knowledge of deceased's presence on the platform was when the car was entering the curve, when he saw him lift his hand as if for a signal; that about this time witness threw off the power, and deceased at the same moment opened the gate across the entrance, and stepped down on the car step; that witness warned him, but he did not stop, and stepped down into the street. This witness said the car was running about 15 miles per hour, and others, who were passengers, placed it at from 10 to 15 miles per hour, and none of them seemed to think the car was going too fast. *Held*, that the evidence was insufficient to sustain a verdict based upon any negligence of defendant.
    Hirschberg, J., dissenting.

Appeal from trial term.

Action by Helen Bruce, administratrix, against the Brooklyn Heights Railroad Company. From a judgment in favor of plaintiff, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

John L. Wells, for appellant.
Gilbert D. Lamb, for respondent.

WOODWARD, J.   This action was brought to recover damages for personal injuries resulting in the death of plaintiff's intestate through the alleged negligence of the defendant.  We apprehend that it is not the law of this state that a street surface railway must be built upon a straight line, after the manner said to have been directed by the czar of Russia in the construction of a transcontinental railroad, or that in the practical operation of the cars they shall be so handled as never to sway or vibrate.  We shall assume that such corporations may construct their lines upon approved engineering plans, with such grades and curves as shall be necessary in the practical accomplishment of the purpose for which they are created; and that in the operation of the cars they may, subject to the liability for the negligent injuring of passengers or persons lawfully upon the highways with their property, run them in such a manner as to meet the requirements of transportation. In other words, it is not required that in the operation of street railway cars there shall be no swaying of the cars, no jars or jolts. These are reasonably to be expected in the practical discharge of the duties which are assumed by the corporation in accepting its franchise, and it is the duty of passengers to take notice of the obvious fact that a car weighing from 4 to 10 tons, running at a practical rate of speed, will be subject to the laws of applied mechanics, and will be swayed with greater or less violence in passing around curves, and will be jolted to some extent in passing over other tracks at street intersections.  This does not give the street railway company a license to operate its cars without regard to the safety of passengers.  It owes them the duty of carrying them in safety over its lines, provided, always, that the passenger has been guilty of no neglect contributing to the accident.  For instance, if a passenger is occupying a seat in a car, and voluntarily leaves that seat, and steps down upon the running board of an open car, and, without taking hold of anything, relies upon his being able to keep his balance, and the car, in passing around a curve, should throw him off, the company would not be liable, even if it were negligent in the operation of the car; and the burden of proving lack of contributory negligence is upon the plaintiff at all times.  It is true, of course, if the injury happened to the passenger while occupying a seat provided by the company, the presumption of lack of contributory negligence would at once arise; but it is none the less proved by the plaintiff by establishing the facts which made it impossible for the passenger to contribute to the accident, as in the case of a collision or the derailing of a car.  There are no presumptions that a man has been free from contributory negligence. The plaintiff must affirmatively show, either by direct proof or by facts and circumstances from which the inference may be properly

drawn, that the plaintiff has been guilty of no act directly contrib-
uting to the accident (Chisholm v. State, 141 N. Y. 246, 249, 36
N. E. 184, and authorities there cited); and this court, in the case
of Brainard v. Railroad Co., 44 App. Div. 613, 61 N. Y. Supp. 74,
recognized no new rule of law. It was there said: "It is fair
to assume, we think, that the deceased, as he stood upon the running
board of the car, was using such means as were furnished for se-
curity to a person standing thereon;" but the court did not assert
that this assumption would be justified in all cases, for it contin-
ued: "He had ridden some distance, and maintained his position,
and the language of one of the witnesses who saw him is that, as
'the jerk came, * * * Mr. Brainard was knocked off.' The lan-
guage of the other witnesses, and the fact that a person must use
a support to remain upon the running board while a car is in motion,
justify the inference that it was the sudden jerk which caused the
fall, and not any lack of making use of the supports. The car was
crowded with passengers, and riding upon the running board was
not per se negligence." It thus appears that the facts as they were
established by the evidence were the basis for the assumption that
the deceased had made use of the opportunities for holding on while
in a position of danger, and not any presumption which arises that
a man has been free from contributory negligence. It simply stands
at the commencement of the trial at zero, and the plaintiff is called
upon to establish affirmatively that the deceased was not guilty o
acts contributing approximately to the accident. This may be done
by showing facts from which the inference may be fairly drawn, as
well as by direct proof. Thomas, Neg. 359, and authorities cited.

Having these fundamental principles of the law of negligence in
mind, we will look at the facts developed by the evidence in the case
now before us. The accident producing the injuries complained of
occurred at what is known as "Rapalyea's Curve" in Grand street,
Brooklyn. This is approximately a 33° curve, with a radius of from
185 to 200 feet, and is described by one of the witnesses as a "wide
curve," as distinguished from a right-angle curve along ordinary high-
ways; and while it is not to be doubted that a car approaching this
curve at a high rate of speed would be swayed sufficiently to disturb
the equilibrium of persons standing up without support, there is
nothing in the evidence to indicate that the car in use at the time of
this accident was swayed enough to cause more than a momentary
disturbance of the equilibrium of the passengers seated in the car, or
that it would have been remembered by any of them, except for the
accident which occurred at about the same time. The plaintiff's
intestate was a policeman, and two of his brother officers, who were
in the car at the time of the accident, and who were called by the
plaintiff, testify that there was nothing in the movement of the car
on this occasion of which they complained. One of them says,
"I was perfectly satisfied to have the car going as it was;" and the
other says: "None of us made any complaint concerning the speed
that the car was going. There was nothing in the way that the car
was going that appealed to us as police officers that seemed to de-
mand our interference, so that none of us spoke to either the motor-

man or conductor. So that, for all practical purposes, I and my brother officers were satisfied with the way the car was going. We were not making any complaint." The evidence is uncontradicted that Mr. Bruce, plaintiff's intestate, entered the car of the defendant about half a mile from the scene of the accident, and occupied a seat inside of the closed car; that he was in the habit of riding in the cars of the defendant in coming home from his beat, and that he usually left the car about 300 feet beyond the curve where this accident occurred, the car running out from Brooklyn toward Newton; that when about 500 or 600 feet from the curve Mr. Bruce left his seat inside of the car, and went out upon the front platform at the left of and behind the motorman, and stood with his back against the front of the car. Only two persons claim to have been eyewitnesses of the accident. One of these was a boy, about 17 years old at the time, who testifies that he saw Mr. Bruce upon the front platform, and that when the car struck the curve it was running at the rate of about 20 miles per hour, and that Mr. Bruce was thrown over the chain which was placed across the entrance to the front platform on the left-hand side, striking upon his head, producing the injuries resulting in his death. This witness testifies that this chain was about 3½ feet high; that he saw this chain at a distance of about 1,400 feet, though at the time he was where he would have to look over the gate upon the right-hand side of the car, past the motorman and the plaintiff's intestate, in order to see this chain. The evidence is overwhelming that there was no chain in use upon this car, the entrance on the left-hand side being guarded by an accordeon or folding gate. The evidence is that Mr. Bruce was not a tall man,—a little taller than counsel for the plaintiff,—and that he weighed about 165 to 170 pounds. He was standing, or had been standing, the last time he was seen alive by plaintiff's witnesses inside of the car, upon the front platform, back of the motorman, with his back against the front of the car, and to the left of the motorman, so that he must have been within two feet of the alleged chain, if there was a chain, which the witness says was three and one-half feet high; and this witness testifies, "I seen, just as the car came around the curve and hit the curve, Bruce was lifted off his feet, and thrown over the chain," and that his head struck the pavement first. Assuming that Bruce was six feet tall (and the evidence would not support such an assumption), and that the chain was 3½ feet high (and this is the evidence,—"about three foot and a half"), and that Bruce was 2 feet from the chain, does any one believe that a man weighing 165 pounds could be thrown over this chain in the manner described by the witness, particularly if we take this evidence in connection with the evidence that the passengers within the car were not seriously disturbed by the lurching of the car as it reached the curve? If this is not a physical impossibility, it is certainly highly improbable; and when we remember that it rests wholly upon the testimony of this boy, who swears that he saw this chain at a distance of about 1,400 feet, when the evidence is overwhelming that there was no chain upon the car, and that he did not, after witnessing the accident, remain to see whether the man was killed or not, and that he did not re-

port the accident at home, or tell any one of the fact that he had seen the accident up to within a few weeks of the trial, the whole case seems so unworthy of credence that, if the testimony was wholly undisputed, we should feel that injustice would result from an affirmance of the judgment. This boy, Benjamin Coordes, is the only witness who places the speed of the car at 20 miles per hour, the others ranging from 9 to 15 miles per hour; and it is the defendant's witness, the motorman who was running the car, who mentions this speed as having been attained before reaching the curve, though he says the car was running up a slight grade, and that the power was turned off, so that the speed was somewhat reduced at the moment of the accident. This witness, who appears singularly frank and straightforward, and who was the only other eyewitness of the accident who was produced upon the trial, says that he had been running the car at the rate of about 15 miles per hour; that he does not know when Mr. Bruce came out on the platform; that the first intimation of his presence was when he was just about to enter the curve; that at that time deceased "raised his right hand partly at my side. He did not touch me, nor did he speak. He raised the hand, so I took that as a signal that he wanted to get off. And whether I had thrown off my power before that or not I don't know, but I threw off the power about that time anyhow, as I would have done whether there was a person getting off there or not, in order to round the curve. So I proceeded to stop the car, and just simultaneously with his signaling me he caught the bolt of the gate, drew it up, pushed the gate toward the dashboard, and stepped down on the step of the car. I shouted to him to hold on, or some words to that effect, but he didn't. He stepped right down in the street, and, although I won't state positively, I believe he didn't have hold of anything when he did step." There is no evidence to dispute the statement of the motorman that he did not know that Bruce was upon the platform until the latter signaled. The evidence is overwhelming that the car was equipped with the kind of a gate which the motorman describes as being opened by plaintiff's intestate, and the boy who tells the story on which the plaintiff relies not only contradicts himself, refusing to answer pertinent questions, but not one of the witnesses who were concededly on the ground was able to say that they had any recollection of seeing him anywhere in the vicinity. The boy himself makes no mention of any one with the exception of the motorman and Mr. Bruce, and he says upon cross-examination: "All I seen was Mr. Bruce. That was all. I saw Mr. Bruce. He was lying right between the two tracks straight up and down. The car had come to a stop by that time. I did not see people get out of the car. I did not see any officers get out of the car at all. I didn't see any officers there at all." Yet the evidence is undisputed that the two officers were there; that they got out of the car as soon as it stopped, and ran to the man who had been injured; and it is also undisputed that the conductor and motoneer were there, and ran to the assistance of Mr. Bruce, while two or three other passengers disappeared in the excitement. This

all occurred in a thinly-settled district, where it would be very strange if seven or eight people could congregate around a man who had been thrown from a street car and seriously injured without their being seen by the person who witnessed the accident; and the car stopped, as appears from the evidence, within 30 feet of where Mr. Bruce was lying, and at least three or four persons must have been near Mr. Bruce within a few seconds of the time that he received the injury.

But, assuming that this witness, Benjamin Coordes, was not discredited, and that the jury was bound to believe that Mr. Bruce was thrown over the alleged chain, there is no evidence that plaintiff's intestate was free from negligence contributing to the accident. Coordes does not mention any act on the part of Mr. Bruce, or anything from which such an inference may be drawn; and no one else, with the exception of the motorman, pretends to have seen him at the time of the accident. All that is established by the evidence is that Mr. Bruce left the interior of the car, where it is not to be doubted he was perfectly safe, and took a place upon the platform of the car. Conceding that it was not negligence per se to occupy a place upon the front platform of a car, it is equally certain that it is not evidence of lack of contributory negligence. No legitimate inference may be drawn from the fact that a man leaves the interior of the car where he is not crowded, and where the defendant has afforded accommodations for its passengers, and goes out on the front platform, that he is free from contributory negligence at a time when he reaches the platform. It is undisputed that he gave no sign to the motorman that he was present upon the platform until just at the moment of entering upon the curve; and, if it be held that it was negligent upon the part of the defendant not to operate its cars in such a manner as not to injure one who had quietly taken a place upon the platform without the knowledge of the defendant's servants, it cannot be said that it is evidence of a lack of contributory negligence on the part of plaintiff's intestate, and without such evidence the plaintiff cannot recover. It should be remembered that the defendant is not called upon to prove that the plaintiff's intestate is guilty of contributory negligence. The burden is upon the plaintiff to show that the deceased did no act approximately contributing to the accident (Riordan v. Steamship Co., 124 N. Y. 655, 26 N. E. 1027), and we search the record of this case in vain for such evidence. The defendant had erected gates or a chain for the purpose of guarding the entrance to the front platform. There was no invitation, express or implied, for passengers to occupy a place upon this platform, which, it may be assumed (for it is in accord with public policy and the safety of passengers and those occupying the highways), was reserved for the use of the motorman, whose duty it is to keep a lookout ahead, and to get his instructions from the signals given by the conductor as to matters which are not within the scope of his vision; and if plaintiff's intestate went out there, and stood up, when there was no occasion for his leaving the interior of the car, without giving the motorman any intimation of his presence, it may be that the de-

fendant owed him no higher duty than it owed to passengers who
were inside of the car, and occupying the seats provided for them.
It is not, however, necessary to determine this point. The plaintiff
has failed to establish by evidence that her intestate was free from
contributory negligence, or to bring forward any facts from which
such an inference may be legitimately drawn; and the weight of
evidence is clearly with the defendant, not only that the accident
was not due to the negligence of the defendant, but that the injury
resulted solely from the negligence of the plaintiff's intestate.

Under such circumstances it only remains to say that the judg-
ment should be reversed, and a new trial granted, with costs to
abide the event.

GOODRICH, P. J., concurs.

JENKS, J. (concurring). I concur with my Brother WOOD-
WARD, J., in his conclusion that the judgment and order should
be reversed, but I express no opinion on the question of the failure
of the plaintiff to prove the absence of contributory negligence on
the part of her intestate. I thus vote for the reason that I am dis-
satisfied with the verdict, in that I think it is against the weight
or the preponderance of the evidence. McDonald v. Railway Co.,
167 N. Y. 66, 70, 60 N. E. 282. I cannot accept the verdict as the
final determination of a jury when it is based upon the testimony
of a single, and to me an unsatisfactory, witness, who saw the acci-
dent from a distance, and who testifies that the lurch of this car,
while going around the curve, threw an adult over a chain which
guarded the front platform at an approximate height of 3 or 3½ feet.
If such a story does not tell of an occurrence physically impossible,
it seems to me that such an accident is inherently improbable. And
this witness is not only contradicted by the motorman, but his state-
ment of such an exhibition of centrifugal force is utterly irreconcil-
able with testimony of the character of the lurch and of the com-
parative slightness of its effects given by several disinterested wit-
nesses called by the plaintiff. There is another version which ac-
counts for the accident without casting any liability on the defend-
ant. I do not pretend to say that it is the truth, but I make this
mention in order that it may appear that there are two versions
of the occurrence. The fact that the jury has given credit to the
version of the plaintiff does not foreclose us from a decision that
the record does not satisfy us that she has made out a case, and
that, therefore, justice will be promoted by a submission of the issue
to another jury.

WILLARD BARTLETT, J. I concur in the foregoing opinion
of JENKS, J.

HIRSCHBERG, J. (dissenting). I cannot concur in either of the
opinions for reversal, each of which is supported by only two votes,
and the new trial must therefore be without the settlement by a
majority vote of the law applicable to the case. I cannot concur

in the two main points which make up the opinion of Mr. Justice WOODWARD, because I regard them as not only without justification upon the facts, but as inherently inconsistent. He states that the accident as testified to by the plaintiff's witnesses, "if not a physical impossibility," is "certainly highly improbable"; and to this point he adds another, suggesting, but without deciding, that the plaintiff's decedent was guilty of contributory negligence in leaving a place of safety and going out upon the platform. While the opinion avoids the expression of any positive conclusion upon this latter point, it does state as ground of reversal that there is no evidence of a lack of contributory negligence upon the part of the deceased; that is, no evidence that he took any precautions to guard against the assumed dangers of the position which he had chosen voluntarily to occupy. It is obvious that if the platform was so securely guarded that the accident which is alleged to have occurred was highly improbable or physically impossible, it was not a place of danger, or one where any unusual precautions would be required. Precaution is only required in the presence of possible danger. It seems to be fairly settled that the question whether the proof establishes freedom from contributory negligence where the accident could occur without fault on the part of a deceased person is for the jury to determine, while the assumed improbability or impossibility of the occurrence in this case finds so little support in the evidence that neither on the first argument of the appeal nor on the reargument afterwards directed by the court did counsel for the appellant venture to either urge or suggest it. Indeed, it can hardly be doubted that a car driven around a 33° curve at the rate of even 15 miles an hour could throw a man over either a gate or a chain, and the fact that it actually did do so in this particular instance, if the witnesses for the plaintiff are believed,—as they were believed by the jury,—certainly furnishes some corroboration of the existence of the physical possibility.

The opinion of Mr. Justice JENKS rests chiefly upon the statement that he is "dissatisfied" with the verdict as against the weight of evidence. This conclusion, as will be seen, differs from the view of the evidence which I have adopted. I cannot see how the verdict can be fairly regarded as against the weight of evidence. Aside from the physical conditions, the only evidence on the appellant's part consists in the testimony given by the motorman who was in charge of the car, and, as his credibility was a question for the jury upon well-established principles, I cannot see how evidence which the jury is at liberty to reject can ever assume the dignity of preponderance.

As the court has divided into three distinct parts upon the decision of this appeal, it seems to me that there should be union upon one point at least, viz., that the case presents facts from which intelligent men may draw different inferences, and is therefore one peculiarly within the province of a jury, whose conclusion, when fairly reached, in the absence of legal error, should not be lightly overthrown. The facts, as the jury must have found them, are of the essence of simplicity: The plaintiff's intestate, Millburn Bruce,

a policeman, after his night's work was done, boarded one of the defendant's closed cars at about 8 o'clock in the morning of December 16, 1899, at the car stables at Mazpeth, Long Island, to go to his home on the North Hempstead road. The distance is about a half mile, and the running time two minutes; the average running time being 15 miles an hour, including stops, for the round trip to and from Flushing. The accident occurred on Grand street, while rounding a very sharp curve, known as "Rapalyea's Curve." The North Hempstead road intersects Grand street with Maiden Lane at a point 600 feet distant from this curve on the Mazpeth side, but Bruce was in the habit of leaving the car at a point about 300 feet beyond the curve on the Flushing side, where a path through Teeve's lot led directly to his house. There was evidence tending to show that it was customary to slow up in going around Rapalyea's curve, and the conductor in charge of the car on the occasion in question frankly admitted that he had never gone around the curve at a higher rate of speed than 9 or 10 miles an hour, always going perfectly easy and gentle, and without any jolt. The motorman, however,—this being the first time he had operated the car,—testified that he approached the curve at the rate of 15 miles an hour; that it was customary to go around on full speed; that he considered 15 miles an hour safe to go around it, and that he would not consider it necessary to slow up if he was going at the rate of 15 miles an hour. There was abundant other evidence tending to show that on this occasion the car was not slowed up at all on the curve, and that its speed was as great as 20 miles an hour. When Bruce boarded the car, he sat down in company with two other officers, and remained seated until after the car had passed the junction of Grand street with the street on which he lived; that is, until after it had passed Maiden Lane. He then stepped out upon the front platform, with the view of leaving the car in accordance with his invariable habit when it reached his path, 300 feet beyond the curve. But when the car struck the curve, as it must have done almost as soon as Bruce got upon the platform, instead of going around "easy and gentle," as customary, it struck the curve with a violent jolt, and Bruce was thrown over the gate or chain, at the side of the platform, striking his head upon the roadway, and being instantly killed. The highest estimate given as to the length of time he was on the front platform is five seconds. The time must have been very short. One of the officers testified: "A sudden jolt of the car, and I looked forward, and he was gone. I looked over the side, and he was lying in the street behind the car." "The car jolted, and I looked forward, and Bruce was gone." "I missed him as soon as the car jolted, then I missed Bruce. I looked forward, and he was gone." The inference from this evidence is a natural one,—that the sudden jolt and Bruce's disappearance were coincident,—and this inference is greatly strengthened by the evidence as to the nature and extent of the jolt, and its effect upon those inside the car. The officer above quoted testified:

"Q. What sort of a jolt was there immediately preceding the accident, when you observed that he was gone? A. It was a jolt pretty near enough to throw me on the floor. Q. And how did you have your feet placed? A. I sat this way in the car (illustrating). Q. With your face in which direction? A. I was sitting about like that, you know. My body was a little towards the rear. Just about the position that I am sitting now, and the car went this way. Q. How strong a movement was that? A. The car was going along, I should judge, at about twelve miles an hour or more; ten miles anyhow. Q. Twelve miles an hour or more? A. Yes, sir. Q. Was it going at that rate of speed as it rounded Rapalyea's curve? A. Yes, sir. Q. Was there any slackening of the speed as it approached the curve? A. No, sir; not as I know of; not to the best of my knowledge."

He further testified that as the car approached the curve the conductor was engaged in an attempt to fix the fare register, but "before he got a chance to do anything the lurch came," and threw him into the corner of the car against the side and door. It is true that this officer admitted on cross-examination that he made no complaint of the speed of the car, and that he and his brother officers were satisfied with its speed, etc., and some significance appears to be attached to these very natural and proper statements as though they tended in some way to impair the plaintiff's claim, or to weaken the overwhelming evidence that the speed of the car was dangerous upon the curve. But there was certainly no obligation imposed by law or otherwise upon this witness requiring him to make a complaint; the time and place were not propitious for filing complaints; the commotion and disturbance in the car naturally absorbed the passengers in the necessary bracing of themselves for safety; and above all the speed of the car furnished no just cause of complaint, inasmuch as it was only in accord with the average running time, and was entirely safe where the track was straight. The fact seems to be overlooked that there was no just reason for any complaint until the car struck the curve without slackening speed. Up to that point the conditions were entirely normal. But at that point there is scarcely a pretense that the car was slowed down at all as on previous occasions. If it was slowed down, it was not done to an appreciable extent, according to the testimony either of the motorman himself, as will be seen hereafter, or of the passengers; and the result was (and this is the cause of the present complaint) that when Bruce stepped out upon the platform to prepare himself for getting off the car, as was his custom when he reached Teeve's Lane, instead of encountering an easy and safe glide around the curve in accordance with his former experiences, and upon the reasonable expectation of a repetition of which the jury might have concluded that he was entitled to rely, he met his death as the almost inevitable consequence of the car striking the sudden curve at a rate of speed which was extremely dangerous there, however safe it may have been theretofore. The other officer also testified that the car was going "pretty fast,"—between 10 and 12 miles an hour,—and that he noticed no difference in the speed of the car as it approached the curve; and he likewise illustrated the manner in which his feet were braced, and the effect which the jolt nevertheless had upon his body, head, and

shoulders, to the probable understanding of the jury, although difficult to reproduce in the printed record. He was asked:

"Q. What sort of a movement of the car was there as it struck the curve? Did you notice anything? A. Well, what I got myself. As soon as it struck the curve, I went that way (illustrating), and went back again. I was not lifted from my seat at all. The forward part of my body and my head and my shoulders went that way, and then went back. I had my feet that way in that position (illustrating). My heels were like that. Q. Where were they placed in the floor? A. Well, they generally stick in the grating, you know, slightly, like that."

From all this evidence there is no difficulty in realizing how the occupants of the car were affected by the violent lurch necessarily incident to the striking of such an abrupt curve at such a high rate of speed, and also how little chance of safety there could be for any one upon the platform unprepared for danger, and unwarned of the motorman's intention to go around the curve at a reckless and unslackened pace.

There was also an eyewitness upon the highway, a lad then of 17, who chanced to be within 100 feet of the occurrence at the time. He testified that the car was running very fast, at the rate of 20 miles an hour; and, to quote his language, "I seen, just as the car come around the curve and hit the curve, Bruce was lifted off his feet and thrown over the chain." His testimony is criticised because he insisted that it was a chain, instead of a gate, over which the unfortunate officer was flung to his death; but, even if it be conceded that the evidence of defendant's employés preponderates in establishing that it really was a gate, this should not so far militate against the truthfulness of this disinterested youth as to make the question presented one of law instead of fact, or to remove its solution from the province of the jury, who saw and heard him, and could well weigh his evidence as men of sound, practical, common sense. So, too, his evidence is criticised because he did not tell the story that day at home. But his father testified that the boy commenced to tell it, but was interrupted by him with the brutal threat: "Don't you dare to say a word about it. If you do, I will throw you out of the house." This was accompanied by other threats, which served to silence him until the trial. Upon the trial he was subjected to every artifice of cross-examination, and, although manifestly nervous, and confessedly sick and frightened, his testimony, corroborated as it was in every essential particular, was not shaken in the least. He stated the number of the car accurately, as it afterward turned out. He saw the man thrown out, and saw him strike his head upon the pavement at the precise time and place and in the manner testified to by the others. He was sure the man was not on the step of the car, and that he did not step off. On the contrary, he testified the car "made a sudden jerk, and he went off." The facts that the witness was young and sick and frightened; that the effect of the awful sight was to make him sick at his stomach; that when he went home he was there terrified into silence; that he was confined in a hospital for troubles of the heart and kidneys; and that he was clearly no match for brilliant counsel in an intellectual contest on the subjects of

measurements, distances, and the nicer points of the compass,—do not necessarily and as matter of law prevent a jury from believing him. His story is inherently credible, and in its main features is fully corroborated by the other witnesses, as well as by the mute testimony of the dead body. The whole presents a case clear and convincing, such as is rarely to be found in litigation of this character.

As against this mass of evidence the defendant had but the testimony of the motorman. He represented the defendant at the time of the accident, and whatever blame there was was his. He had the highest interest in negativing the theory of the plaintiff's witnesses to the effect that he came upon the curve so swiftly and recklessly that his passenger was powerless to resist the sudden lurch; and, as I have said, it is well settled that, whatever his story may be, it goes to the jury on the question of credibility, if nothing else, and therefore it cannot of itself so overpower the combined evidence of several disinterested witnesses as to justify either a nonsuit or a reversal. Aside from this feature, his story is vague, shadowy, and unsatisfactory. He says "the car glided around the curve swiftly," although all he says on the question of speed is that the car was not going quite as fast as 15 miles an hour just at the moment the man fell. He did not know whether Bruce came on the platform just then, or whether he had already been there some time, but, however that may be, Bruce just then raised his right hand, apparently as a signal that he wanted to get off, and simultaneously, without waiting for the speed of the car to slacken, and in spite of warning shouts from the motorman for him to hold on, opened the gate, and "stepped right down in the street." This story, while, of course, proper for the consideration of the jury, is certainly not devoid of elements of improbability. The conduct of the motorman, according to his own story, indicates that it was hazardous in the extreme to attempt to get off the car at the time and place, or why did he shout a warning? He testified:

"I shouted to him to hold on, or some words to that effect; but he didn't. He stepped right down in the street, and, although I won't state positively, I believe he didn't have hold of anything when he did step. As soon as his foot touched the ground, his body swung around, and he fell, and he seemed to me on the back of his head."

As soon as the car was stopped, the motorman got off, and the first question he asked was, "Is he killed?" In view of the facts that Bruce did not want to get off at that point, not having yet reached his path by some hundreds of feet; that it was broad daylight; that the speed of the car, whatever the number of miles per hour, if obviously dangerous to the motorman, must have been equally so to Bruce; that the curve was equally visible and known to both, so that no possible reason exists to justify the theory that the deceased supposed that to be a safe act which to the motorman was so imminently hazardous that he immediately anticipated death as a result; that no circumstances in the case suggest suicide; that the senses of the deceased, so far as appears, were normally susceptible to the surroundings, and especially to the shouted

warning; and that, although several persons aided in carrying the body to the car, no one testified that the gate was found open,—it cannot be said that this story of a deliberate step to certain death was either plausible or convincing. If there was a gate at the platform, instead of a chain, it may, of course, be true that the deceased opened it, and stepped down upon the step in readiness to get off when he reached the lane, and in reliance upon the usual slackening of speed which would have made that act safe. The car then striking the curve at a high rate of speed would sufficiently account for the result, without necessarily involving contributory negligence as matter of law. And such a story would not be condemned as unlikely. But the one herein adverted to as told by the motorman, to the effect that the deceased stepped off the swiftly moving car before reaching his destination, and in spite of warning, seems, under all the circumstances, to be opposed to ordinary experience, and at variance with the natural instincts of self-preservation; and that conflicting story must be unreasonable, indeed, which a jury of average intelligence would reject in order to give this one credence. Under these circumstances the learned trial justice very properly left to the jury the task of deciding between the two opposing theories in a charge so lucid and fair that no exception was taken, —charging, indeed, every request made by the defendant's counsel; and I am unwilling to say that the conclusion reached is so irrational in itself, or so feebly supported by the evidence, as to require or justify another trial.

I therefore vote for affirmance.